**KANSAS CITY TERMINAL RAILWAY COMPANY, a Corporation, Respondent,**

v.

**Keith L. MANION et al., Appellants.**

**No. 22522.**

Kansas City Court of Appeals.

Missouri.

Nov. 5, 1956.

Ralph M. Jones, Charles B. Blackmar, Blackmar, Swanson, Midgley, Jones & Eager, Kansas City, for appellants. Harold C. Heiss, Russell B. Day, Cleveland, Ohio, of counsel.

Clarence M. Mulholland, Richard R. Lyman, Toledo, Ohio, Edward J. Hickey, Jr., Washington, D. C., Mulholland, Robie & Hickey, Toledo, Ohio, of counsel, for Railway Labor Executives' Ass'n, amicus curiae.

Horace F. Blackwell, Jr., Sam D. Parker, Lathrop, Richter, Blackwell & Parker, Kansas City, for respondent.

FRED H. MAUGHMER, Special Judge.

The Railroad, by complaint, sought and the Circuit Court on July 7, 1955, granted an Injunction against the threatened, imminent strike by the national Brotherhood, local lodge and named defendants in a class. Evidence was presented showing that Terminal in Kansas City owns and operates the Union Station and terminal facilities for 12 interstate railroads, its service, including engines and tracks, switching and transfer of passengers, mail, baggage and freight cars. Evidence was also offered tending to show that the proposed strike would not only paralyze Terminal's busi-

**32**

ness, but would cripple the railroad transportation system in Kansas City and adversely affect it throughout the whole area. Defendants generally concede these conclusions.

Defendants petitioned to remove this cause to the Federal District Court for the Western District of Missouri. On Terminal's Motion the case was remanded to the state court by Hon. Albert A. Ridge, District Judge. Thereafter, defendants' motion for judgment or in the alternative motion for new trial was denied. Defendants then appealed to the Supreme Court of Missouri, which court ruled it was without jurisdiction and transferred to the Kansas City Court of Appeals. See Kansas City Terminal Railroad Company v. Manion, Sup., 290 S.W.2d 63.

On March 31, 1951, plaintiff and The Brotherhood of Locomotive Firemen and Enginemen entered into a collective bargaining agreement providing that all claims or grievances by or on behalf of any employee would be processed by presentation to the carrier's designated officer, and could be appealed from rank to rank to the carrier's highest officer designated to handle claims and grievances. Paragraph C, Article 7, of the Agreement provides "All claims or grievances involved in a decision of the highest officer shall be barred unless within six months from the date of said officer's decision, proceedings are instituted by the employee or his duly authorized representative before a tribunal having jurisdiction pursuant to law or agreement, of the claim or grievance involved." On April 16, 1953, the "No New Work Rule" amendment was added. This Amendment provided that engineers, firemen, and hostlers would be given no new work after completing an eight-hour day, but that they might be required to finish work assigned before the end of the eight hours and which they were proceeding on at the end of the eight hours.

Many disputes arose between Terminal and the workers, involving interpretation and application of the agreement as amended by the "No New Work Rule." Claims were filed by or on behalf of numerous employees for penalty pay. These were presented by the Brotherhood through administrative channels to the carrier's highest officer designated to process such claims, all as provided in the agreement. Among others, these facts were stipulated by the parties:

(1) "Payment has been made for all straight-time work by the employees for or on whose behalf claims herein involved have been presented and overtime for hours actually worked has been paid at one and a half times the computed hourly rate of the employee."

(2) That time claims for penalty pay were filed on behalf of or by 1114 engineers and 1069 firemen. These claims were prosecuted through carrier officer channels and appealed to Mr. C. E. Breternitz, the carrier's highest officer designated to handle claims and grievances.

(3) That each of these claims has been denied by the said C. E. Breternitz, the dates of the various denials being set forth in the stipulation.

(4) "That no proceedings to enforce the payment of any of the time claims has ever been instituted by any defendant or by his duly authorized representative before any court or before the National Railroad Adjustment Board or before any tribunal having jurisdiction thereof, pursuant to agreement of the parties".

Giving consideration to the denial dates as set out in the Stipulation and the date of the Circuit Court's Injunction, we find that more than six months elapsed between the last final denial and the issuance of the injunction. It could here be stated that "overtime pay" which Terminal paid was time and one half for work hours required over eight in one day. "Penalty pay" which defendants claimed, was for one full day's additional pay, if they were required to work more than the eight hours.

On February 3, 1954, the Brotherhood distributed among its employees a strike ballot on four questions: (1) Time claims based upon the "No New Work Rule." (2) Time claims based upon the Terminal's action in permitting Kansas City Southern crews to do switching at the Cudahy Plant. (3) Miscellaneous time claims based upon other provisions of the agreement. (4) Proposed changes in the terms of the collective agreement. The result was a majority vote for the proposed strike if the Brotherhood was unable to get these claims satisfactorily adjusted.

On February 11, 1954, Terminal invoked the services of the National Mediation Board under Item 4; that is, the proposed changes in the terms of the collective agreement, but took the position that Items 1, 2, and 3, namely, the time claims, were not mediable. Federal Mediator Lane was assigned to this dispute. He came to Kansas City on March 23, 1954, to attempt mediation. Terminal refused to discuss the question of the time claims and reasserted its contention that these were not mediable. The Brotherhood sought mediation on all four issues and declared its willingness to forego striking if the Board would take jurisdiction of the entire dispute, but reasserted its intention to strike if the time claims were not included. The National Mediation Board recommended that all issues be mediated and the threatened strike be deferred. Both parties adhered to their positions as first declared. The Brotherhood fixed a date for the threatened strike. Terminal secured this Restraining Order. The Mediation Board quietly withdrew. The U. S. District Court and the Supreme Court of Missouri each disclaimed jurisdiction. So, the controversy and particularly the action of the Circuit Court in granting injunctive relief, comes to this Court for appellate review.

In addition to briefs from the plaintiff and defendants we have been favored with briefs from Conference Committees of both Railway and Labor, as Amici Curiae. As stated on page 67 of Appellants' Brief:

"This case thus turns upon Federal rights, created by a Federal statute, and this Court is accordingly called upon to decide questions arising under Federal law. State courts have, with certain exceptions, concurrent jurisdiction with Federal courts over civil suits arising under the Constitution and laws of the United States. Minneapolis & St. Louis R. R. v. Bombolis, 241 U.S. 211 [36 S.Ct. 595, 60 L.Ed. 961]; Grubb v. Public Utilities Comm. of Ohio, 281 U.S. 470 [50 S.Ct. 374, 74 L.Ed. 972]."

"State courts, when enforcing rights flowing from Federal laws, should enforce them in the same manner and extent as Federal courts would enforce them in similar suits."

■■ Tersely stated, plaintiff asserted it was entitled to the Injunction on two grounds: (A) The Railway Labor Act prohibits a strike to force payment of time claims. It contends that time claims are "minor disputes," as contrasted with, for example, an effort to enforce collective bargaining demands, or write a new basic contract, either of which would be a "major dispute," to secure adjustment or settlement of which, a strike would be a proper procedural weapon. It says, however, that minor disputes must be referred to the Adjustment Board and a strike to coerce settlement of such lesser disputes has for the general public good and in the interest of labor peace been forbidden by the Act. (B) The proposed strike was a breach of the contract entered into by the parties which provided that time claims be prosecuted to the highest carrier official and after denial, claimant had six months and six months only, to institute proceedings before some other tribunal having jurisdiction thereof (plaintiff claiming this authorized tribunal was the National Adjustment Board); that since claimants permitted six months to elapse after final denial without proceeding further, the claims under the contract are barred, and that all of these

requirements were strictly in conformity with the Act.

Defendants assert that the Railway Labor Act and the judicial precedents interpreting the same do not forbid but rather recognize the right to strike. They claim that the Common Law, too, recognizes, and the Constitution protects, an individual's right to work or not work—a condition which is surely one of the attributes of human liberty. It might be observed here, of course, that the right of an individual person to work or not to work is not involved. We are concerned only with group or concerted action.

The National Railway Labor Act does not exactly spell out either Terminal's or Defendants' interpretation. Federal Courts have differed both as to meaning and application. It is agreed, without exception we think, that in correctly determining the question, we must examine, review, and consider Railway Labor Law as it has developed in America during the past 36 years. We must examine the legislation enacted. We must seek for the legislative purposes. We must abide by authoritative judicial interpretations. All this must be done in the light of national economic change and growth.

With the emergence of big industry in America, engaged in far-flung interstate commerce, employing thousands upon thousands of workers and furnishing products and services required daily by the people, the interest of the national Public in labor relations became apparent. Our national transportation system based largely upon railroads was a critical field. It became evident, too, that only by organization through unions could the workers present the force, finance, and capacity to adequately and effectively present their cause to employers, to the Public and to the Congress.

It has long been recognized that the right to strike and to strike through concerted action is an inherent right. 31 American Jurisprudence, Labor, Section 192, says:

"Generally.—It is the settled general American rule, effected largely without the intervention of legislation, that workmen who are not bound by contract for a definite period, and have not by agreement, freely made, given up such rights, may, without liability, abandon their employment at any time, either singly or in a body, as a means of compelling or attempting to compel their employers to accede to demands for better terms and conditions."

In American Steel Foundries v. Tri-City Central Trades Council (1921), 257 U.S. 184, 42 S.Ct. 72, 74, 66 L.Ed. 189, Chief Justice Taft said:

"A single employee was helpless in dealing with an employer. He was dependent ordinarily on his daily wage for the maintenance of himself and family. If the employer refused to pay him the wages that he thought fair, he was nevertheless unable to leave the employ and to resist arbitrary and unfair treatment. Union was essential to give laborers opportunity to deal on equality with their employer. They united to exert influence upon him and to leave him in a body, in order by this inconvenience to induce him to make better terms with them. They were withholding their labor of economic value to make him pay what they thought it was worth. The right to combine for such a lawful purpose has in many years not been denied by any court."

Economic growth and change made it inevitable that our national Congress should venture into the field of labor relations. General welfare and interstate commerce offered ample authority. The first effort to control railroad labor relations in any degree began with the Transportation Act of 1920, 41 Stat. 469. This was at the time the railroads were returned to private control and operation after the war period of Government operation. Congress entered this explosive field with much caution and

stayed close to shore. This first Act suggested, approved, and encouraged settlement by peaceful means, of disputes, which might disrupt transportation. It did not limit, alter, or destroy the then existing legal rights of either party. It publicly proclaimed a Congressional interest in and an awareness of the subject.

Six years later the Transportation Act was succeeded by the Railway Labor Act of 1926, 44 Stat. 577, 45 U.S.C.A. §§ 151–163. Here again Congress legislated on the theory of voluntary cooperation of the parties. Machinery for mediation was provided. The interest of the Public in the field was definitely recognized and asserted.

In 1934 the Railway Labor Act was amended. By this Amendment, for the first time carriers and employees were *required* to bargain and to mediate disputes. The Act provides for an Adjustment Board, a Mediation Board, and an Emergency Board. The Mediation Board was not vested with adjudicatory powers. It provided mediation service only, and on "major disputes" alone. The Emergency Board was a body which could be created by the President if he thought the situation or emergency so demanded. Neither of these Boards had the power to decide or force compliance with their recommendations. The Adjustment Board, Sec. 153, subd. 1(i), 45 U.S.C.A., was given jurisdiction to hear and decide disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." Stated another way, the Mediation Board had jurisdiction to hear "major disputes." Both parties were *required* to submit to this mediation, but this Board had no authority to adjudicate disputes or compel compliance. The Adjustment Board, on the other hand, had jurisdiction of the minor disputes, sometimes styled "grievances." If it held in favor of an employee's claim for time pay and the railroad did not comply, it was only necessary to file a petition in some District Federal Court and

the findings of the Adjustment Board are *prima facie* evidence of the facts therein stated, Sec. 153, subd. 1(p), 45 U.S.C.A. Those familiar with labor relations and labor law have, I believe, a very definite understanding as to what constitutes "major disputes" and what constitutes "minor disputes."

Commissioner Eastman, the Federal Coordinator of Transportation, who was one of the principal authors of the 1934 Amendments, testified as follows before the House Committee on Interstate and Foreign Commerce:

"Well, it is my own opinion that there ought not to be strikes with reference to minor grievances of that sort. I should be very unwilling to take away from the employees the right to strike on major issues, but these are not major issues." (Hearings, House Committee on Interstate and Foreign Commerce, 73rd Cong., 2d Sess., p. 61.)

At a hearing before a senate committee on the bill for the 1934 amendments, the Railroad Brotherhoods' representative, Mr. Harrison, stated:

" 'These railway labor organizations have always opposed compulsory determination of their controversies. We have lived a long time and got a lot of experience, and we know that these minor cases that develop out of contracts that we make freely, and * * * we are now ready to concede that we can risk having our grievances go to a board and get them determined, and that is a contribution that these organizations are willing to make.' " Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 728, note 24, 65 S.Ct. 1282, 1292, 89 L.Ed. 1886.

The following letter dated June 14, 1934, signed by Commissioner Eastman and Secretary of Labor Miss Perkins, to President Roosevelt, was put before the Senate at 78th Cong. Rec. 12375 (1934), as an expression of Administrative purpose:

"The Coordinator has drafted amendments to the Railway Labor Act designed to * * * provide for *compulsory* adjustment of individual grievances * * *

"If the proposed amendments are not enacted * * * a host of strike threats and other labor difficulties will arise this summer, demanding presidential intervention. Similar difficulties are also likely to result because of the unavailability of adequate grievance-adjustment machinery as proposed by the amendments."

Mr. Chief Justice Hughes in Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 432, 74 L.Ed. 1034, speaking on the purpose of the Act, said this: "The brotherhood insists, and we think rightly, that the major purpose of Congress in passing the Railway Labor Act was 'to provide a machinery to prevent strikes.'"

The difference between disputes over time claims and disputes over the making of a new collective agreement is well understood in railway labor circles. As to disputes over grievances it contemplates the existence of a collective agreement already concluded.

In Elgin, J. & E. R. Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 1290, the Court said:

"The Act treats the two types of dispute alike in requiring negotiation as the first step toward settlement and therefore in contemplating voluntary action for both at this stage, in the sense that agreement is sought and cannot be compelled. To induce agreement, however, the duty to negotiate is imposed for both grievances and major disputes.

"Beyond the initial stages of negotiation and conference, however, the procedures diverge. 'Major disputes' go first to mediation under the auspices of the National Mediation Board; if that fails, then to acceptance or rejection of arbitration, cf. 7; [Brotherhood of Railroad] Trainmen v. Toledo, P. & W. R. Co., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534; and finally to possible presidential intervention to secure adjustment. § 10. For their settlement the statutory scheme retains throughout the traditional voluntary processes of negotiation, mediation, voluntary arbitration, and conciliation. Every facility for bringing about agreement is provided and pressures for mobilizing public opinion are applied. The parties are required to submit to the successive procedures designed to induce agreement. § 5, First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help. No authority is empowered to decide the dispute and no such power is intended, unless the parties themselves agree to arbitration.

"The course prescribed for the settlement of grievances is very different beyond the initial stage. Thereafter the Act does not leave the parties wholly free, at their own will, to agree or not to agree. On the contrary, one of the main purposes of the 1934 amendments was to provide a more effective process of settlement.

"Prior to 1934 the parties were free at all times to go to court to settle these disputes. * * * Several organizations took strike ballots and thus threatened to interrupt traffic, a factor which among others induced the Coordinator of Transportation to become the principal author and advocate of the amendments. The sponsor in the House insisted that Congress act upon them before adjournment for fear that if no action were taken a railroad crisis might take place * * * the Adjustment Board was created and given power to decide them."

In Slocum v. Delaware L. & W. R. Co., 339 U.S. 239, 70 S.Ct. 577, 579, 94 L.Ed. 795, the Supreme Court said:

"The Act thus represents a considered effort on the part of Congress to provide effective and desirable administrative remedies for adjustment of railroad-employee disputes growing out of the interpretation of existing agreements. The Adjustment Board is well equipped to exercise its congressionally imposed functions. Its members understand railroad problems and speak the railroad jargon. Long and varied experiences have added to the Board's initial qualifications. Precedents established by it, while not necessarily binding, provide opportunities for a desirable degree of uniformity in the interpretation of agreements throughout the nation's railway systems.

"The paramount importance of having these chosen representatives of railroad and unions adjust grievances and disputes was emphasized by our opinion in Order of [Railway] Conductors [of America] v. Pitney, supra [326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318]."

In O. Railway Conductors of America v. Pitney, 326 U.S. 561, at page 566, 66 S.Ct. 322, at page 324, the Court said of the Adjustment Board:

"Not only has Congress thus designated an agency peculiarly competent to handle the basic question here involved, but * * * it also intended to leave a minimum responsibility to the courts."

Counsel for Terminal have attached to their brief the complete Opinion of U. S. District Judge Scarlett in Central of Georgia Railroad v. Brotherhood. Defendants countered by appending the Opinion of the Fifth Circuit Court of Appeals in the same case. There the dispute arose over whose job it was to couple and uncouple steam, signal and air hoses. The District Court granted an Injunction. The Fifth Circuit in a 2–1 division, Brotherhood of Railroad Trainmen Local No. 721 v. Central of Georgia Railroad Co., 229 F.2d 901, reversed and dissolved the Injunction. That majority Opinion ruled that the Norris-LaGuardia Act, 29 U.S.C.A. §§ 101–115, deprived Federal Courts of jurisdiction to enjoin strikes, and declined to apply the Railway Labor Act. The minority Opinion concluded that the Norris-LaGuardia Act did not apply and that under the Railway Labor Act issuance of the Injunction was right and proper.

In this connection we refer to Chicago River & Indiana Railroad Co. v. Brotherhood of Railroad Trainmen, 7 Cir., 229 F.2d 926. Here the dispute was over 19 pay claims and 2 claims for reinstatement. The parties conceded the disputes were "minor issues." The 7th Circuit Court held that the Norris-LaGuardia Act did not apply and that under the National Railway Labor Act the Court had jurisdiction to grant, and under the facts did rightly grant, the 'Injunction.

It should here be noted that on 10–16–56 the Supreme Court of the United States agreed to review both the Central Georgia and the Chicago River cases. Pending that review we note that the 1934 amendment setting up the Adjustment Board came two years after passage of the Norris-LaGuardia Act. In Cook County National Bank v. United States, 107 U.S. 445, 2 S.Ct. 561, 566, 27 L.Ed. 537, the Court said:

"A law embracing an entire subject, dealing with it in all its phases, may thus withdraw the subject from the operation of a general law as effectually as though, as to such subject, the general law were in terms repealed. The question is one respecting the intention of the legislature."

In Virginian Railway Company v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 598, 81 L.Ed. 789 the Court said:

"Neither the purposes of the labor act, as amended, nor its provisions when read, as they must be, in the light of our decision in the Railway Clerks case [Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034], supra, lend support to the contention that its enactments, which are mandatory in form and capable of enforcement by judicial process, were intended to be without legal sanction."

We believe that the provisions of the Norris-LaGuardia Act affect the present Injunction only so far as it is not in conflict with the later provisions of the Railway Labor Act, 45 U.S.C.A. § 152, Subd. 9.

Numerous other cases have been cited in the briefs and extensive excerpts from Congressional hearings have been included. Manifestly, this Opinion can include but few of these citations and quotations. However, consideration of Administrative and Congressional expressions of purposes and objectives, the Legislative enactments through the years, as interpreted and solidified by judicial interpretations, and by long experience, leads inexorably to certain sure conclusions:

(1) The legislative purpose was to provide machinery to prevent or at least lessen the likelihood of railroad strikes.

(2) Respecting "major disputes" Government sought to provide a fair and impartial mediation service (Mediation Board). Both labor and management had representatives thereon. Government authorship, supervision, and Public Opinion each contributed to create an impartial atmosphere, to produce fair recommendations and honorable mediation help, but Government through the Congress has been unwilling to force compliance in this field of "major disputes." Either party may refuse to accept. The employees' right through the Union to strike, while delayed by requiring mediation first, is not destroyed.

(3) As to "minor disputes" which definitely includes disputes over time claims, the governmental authority has determined that the injury to public welfare resulting from a railway labor strike, overbalances, outweighs, and submerges the long recognized right to concertedly strike. The mass of these grievances or minor disputes which arise was also an impelling reason. The law requires the parties to attempt to adjust these controversies among themselves, and if settlement proves impossible, the employee (union) may appeal to the Adjustment Board and upon favorable determination there, the Judgment or finding may be enforced by filing a transcript thereof in a Federal Court. A further objective was to relieve the courts of the necessity of trials on the merits of the mass of grievances and time claims, and controversies which might arise. The Adjustment Board in such disputes was a Referee with power to decide.

Usually these injunctions have been sought in Federal and not State Courts. But, where the threatened strike is violative of both the Bargaining Agreement and the Railway Labor Act, as we find here, the injured party may elect to seek and ought to be able to secure relief in a State Forum. It is abundantly clear that Terminal is without adequate remedy at law. Both the Public and Terminal would suffer irreparable loss if the strike comes. We are unable to find that the Circuit Court abused its discretion in granting equitable relief. Its Judgment in granting the Injunction ought to be and is, affirmed.