PENNSYLVANIA RAILROAD
COMPANY

v.

TRANSPORT WORKERS UNION OF
AMERICA, C.I.O., Michael J. Quill, Eugene Attreed, Andrew Kaelin, C. A.
Quigley, Local 2013 of United Railroad
Workers Division of Transport Workers Union of America, C.I.O., in their
own right and as representative of other local unions of Transport Workers
Union of America, C.I.O. and as representative of Transport Workers Union
of America, C.I.O., John W. Mellon, Jr.,
Edward B. Quigley, J. E. Whitehead,
V. J. Elliott, E. D. Halstead, individually, as officers of Local 2013 and as representatives of the members of Transport Workers Union of America, C.I.O.,
employed by Plaintiff.

Civ. A. No. 28084.

United States District Court
E. D. Pennsylvania.

May 28, 1960.

Robert M. Landis, Warren D. Mulloy,
John B. Prizer, Richard N. Clattenburg,
Philadelphia, Pa., for plaintiff.

Charles A. Lord, Philadelphia, Pa.,
and Asher W. Schwartz, New York City,
for defendants.

VAN DUSEN, District Judge.

The plaintiff corporation has its principal office in this District, operates a railroad with 10,000 miles of line in interstate commerce in thirteen states and the District of Columbia, carried 44 billion ton miles of freight in 1959 consisting of perishable commodities, military supplies, foods, livestock, grain, minerals and finished goods, and transports express, passengers and mail (N.T. 28–30). Defendant Transport Workers Union, A.F.L.–C.I.O. (hereinafter called "T. W. U.") is a labor union which represents, for the purpose of the Railway Labor Act, 15,540 of plaintiff's employees, being those crafts or classes of persons employed by plaintiff known as Boilermakers, Electricians, Carmen (including Coach Cleaners), Car Inspectors, Molders (including Melters and Coremakers), their helpers and apprentices, powerhouse employees and rail shop laborers; and said defendant is doing business in the Judicial District of the United States for the Eastern District of Pennsylvania. Defendant Michael J. Quill is International President of defendant T. W. U. and the principal executive officer of said defendant. Defendant Eugene Attreed is Director of the United Railroad Workers Division and Vice-President of defendant T. W. U. Defendant Andrew Kaelin is a Vice-President and Coordinator of defendant T. W. U. and the principal international officer representing defendants T. W. U. and Quill in this District. Defendant C. A. Quigley is the International Representative of defendants T. W. U. and Quill in the Eastern District of Pennsylvania, with responsibility for all activities of said defendants in the Philadelphia Region of plaintiff. Defendant Local 2013 is an unincorporated Association and a local union of defendant T. W. U.'s United Railroad Workers Division within the territorial limits of the Eastern District of Pennsylvania. Defendant Local 2013 is doing business in the Eastern District of Pennsylvania. Defendant John W. Mellon, Jr. is President of defendant Local 2013 and the principal executive officer and collective bargaining representative of said Local in the Eastern District of Pennsylvania. Defendant Mellon acts for defendant Local 2013 in enforcing the schedule of rules and working conditions and in matters of grievance adjustments on plaintiff's system in the Eastern District of Pennsylvania. Defendant Edward B. Quigley is a member and Executive Vice-President of defendant Local 2013. Defendant J. E. Whitehead is a member and Vice President-Freight Carman of defendant Local 2013. Defendant V. J. Elliott is a member and Secretary-Treasurer of defendant Local 2013. Defendant E. D. Halstead is a member and Recording Secretary of defendant Local 2013. (N.T. 56–58.)

Each of the individual defendants is sued in his own right and as an officer of the two labor unions mentioned above. The officers of Local 2013 are sued as representatives of the members of Transport Workers Union of America, C.I.O., employed by plaintiff. Paragraph 5 of the Complaint contains these two sentences:

"Defendant Local 2013 is truly and fairly representative of the other local unions of defendant T.W.U., and of defendant T.W.U. itself, and the interest of all members, subordinate locals and defendant T.W.U. will be adequately represented in the premises by said defendant Local. Defendant Local 2013 is sued in its own right and as representative of the membership of the subordinate locals and of the T.W.U. itself."

There are presently in effect collectively bargained labor agreements, concluded in accordance with and under the terms of the Railway Labor Act, between the plaintiff and defendant T. W. U., the latter acting as the representative of the classes or crafts of employees referred to above, governing rates of pay, rules and working conditions of the said crafts or classes of employees, and providing a method of handling disputes growing out of grievances or out of the interpretation or application of the said agree-

ment. See Exhibits P–1 to P–1E, inclusive, particularly P–1A and P–1B.

Under said agreements, a grievance procedure has been established whereby disputes, grievances or claims are presented first to the aggrieved employee's foreman, then to plaintiff's Superintendent-Personnel and then to plaintiff's Manager-Labor Relations. Failing settlement at the levels indicated, the grievance then goes to a System Board of Adjustment, established pursuant to the provisions of § 3, Second, of the Railway Labor Act, 45 U.S.C.A. § 153, Second, which is implemented by a written agreement between the parties (Exhibit P–1B) setting up a Board of four members, two representing each side. If the Board cannot reach a decision, the dispute then goes to a neutral referee selected by the Board; if the Board cannot agree on a neutral referee, he shall be designated by the National Mediation Board at the request of any two members of the Board, and his decision shall be final and binding.

The evidence discloses these disputes existed between plaintiff and its employees who were members of T. W. U. on May 16, 1960, the Monday of the week in which numerous work stoppages and picketing were conducted by such employees:

## A. Scope Rules Dispute.

As a result of a notice served by the T. W. U. on plaintiff in June 1957 under § 6 of the Railway Labor Act (45 U.S.C.A. § 156), stating a desire to change the regulations regarding advance notice of job abolishments, etc., mediation has been going on in this dispute ever since that date in accordance with the terms of the Railway Labor Act and agreement of the parties (N.T. 62 ff.). Initially, this proceeding was assigned number E134 by the National Mediation Board (N.T. 166). Mediation was recessed

from November 1957 to January 1958 to permit T. W. U. to confer with System Federation (a union representing these three mechanical crafts: blacksmiths, machinists and sheet metal workers) and present a joint proposal on a scope rule, a work-classification rule, and a rule concerning contracting to outside concerns of work to be done on railroad property (N.T. 68 & 409). On August 1, 1958, the unions presented separate proposals for complete revision of their collective bargaining agreements. Counter-proposals were submitted by plaintiff, but in February 1959, the unions suggested that mediation be resumed (N.T. 69–70). Plaintiff agreed and the case was redesignated as number A5949 by the National Mediation Board (N.T. 70). On September 23, 1959, the unions requested the Mediation Board to terminate its services and that Board suggested arbitration. On November 25, 1959, all three parties executed a written agreement to submit this dispute to a special, one-man Board of Adjustment (N.T. 71) called "a neutral person" (Exhibit P–3). Paragraph 4 of this agreement provided:

> "4. The Organizations and the Carrier will maintain the status quo until 30 days after submission to the parties of the recommendations."

The neutral person (Francis J. Robertson) filed his report on May 4, 1960, having held hearings and conducted conciliation conferences in the meantime (N.T. 71–73 & 423–4). Parts of this report were unacceptable to both parties, but plaintiff was willing to accept it, "taking the bad with the good," but the unions refused to agree to 26 of the recommendations (N.T. 74). At the final meeting on May 11 between plaintiff and the unions at which the report was discussed, the unions delivered to plaintiff a letter stating that a strike would take place on June 6, 1960 (Exhibit P–4).[1] This was the third definite strike threat T. W. U. had issued since June 1957 during the

---

[1] Defendant Quill, the International Executive Council, the Negotiating Committee, and defendant Attreed all approved of rejecting the Robertson report and of setting the June 6 strike date (N. T. 440–443).

course of these negotiations.[2] This strike had been authorized by the Council of Presidents of T. W. U.'s locals on May 3 or 4, 1960, at Pittsburgh (N.T. 438–9). Immediately after these Pittsburgh meetings, defendants Quill and Attreed and Mr. Frank Sheehan, International Director of Organization of T. W. U. (N. T. 430), started on a tour of T. W. U. locals whose members are employees of plaintiff in order to report to the locals on the Robertson report of May 4, 1960 (N.T. 423–4). From May 5 to May 7, these officers of defendant T. W. U. reported to locals at Conway, Pa., Pitcairn, Pa., and Pittsburgh, Pa. From May 9 to 11, they discussed the Robertson report with plaintiff in Philadelphia (N.T. 443). Defendants Quill and Attreed and Mr. Sheehan reported to the Pittsburgh local on May 11 and to the Harrisburg local on May 12. On May 13, they reported to the Altoona locals (2007 and 2017). Prior to this meeting, defendant Quill made a TV broadcast in which he said (P–26 at p. 2; cf. N.T. 330ff., 428–9, 444–5 and 646ff.) :

"Tonight we will decide whether we wait until June 6th or take Mr. Symes, Chairman of the Board of The Pennsylvania Railroad Company, at his word and jump the gun a little sooner! This decision cannot be made by me or our officials—this decision must be made by you, the members of the organization whom we expect to meet in twenty or twenty-five minutes in the Venetian Gardens! "

During the meeting of the locals at the Venetian Gardens immediately after this TV broadcast, Mr. Quill said (N.T. 669 and p. 3 of P–26):

"We feel now is the time to act. We would ask for clarification from Mr. Symes on this question, and failing that clarification we will call your presidents together in Philadelphia

or Altoona or Pittsburgh, and then we will not mark time until midnight, June the 6th. We will give it to them immediately right across the system and in the conference talks. (Applause). We are on top of this thing; let's stick to it. And once and for all, if we are forced to fight the system, we will strike the system, and we will not be satisfied with the scope clause, before we come back, we will have to settle the company 5 cents an hour wage demand, the pensions, the other working conditions, and the job security that is long, long overdue. Goodnight, and God bless you, one and all."

Mr. Fassano, Vice President in Charge of Grievances, Local 2017, personally broadcast from a sound-truck at the entrances to plaintiff's Altoona shops about noon on May 13 a message urging all of plaintiff's employees at the Altoona shops to attend the above meeting, which message contained this language (Exhibit P–25, N.T. 325–7) :

"Second-Trick Employes! We urge you to quit work at seven o'clock as Mr. Quill has a special message for you at 7:45 PM tomorrow. We request first-trick employes to so inform second-trick employes. We assure you, you will not be penalized for leaving jobs tomorrow night. We would like to see management try to stop you!"

Defendants Quill and Attreed continued on their tour reporting to various locals as follows: May 14, Steubenville, Ohio;[3] May 16, Crestline, Ohio; May 17, Cleveland, Ohio; May 18 and 19, Columbus, Ohio (N.T. 444–453). When in Crestline, defendant Attreed learned of the work stoppage at Mingo Junction (Steubenville) on May 16 and of the other work stoppages described below in Columbus on May 18. This group of

---

2. A strike called for November 3, 1957 (N. T. 65) and a strike called for December 1958 (N. T. 71) were announced by T. W. U. but did not take place.

3. Defendant Quill returned to the East Coast on the night of May 14 and joined the others in Crestline on May 16.

officers of T. W. U. were informed of the temporary restraining order of May 18 in Columbus on May 19.

On May 18, 1960, the Mediation Board certified this scope rules dispute to the President of the United States for the creation of a Presidential Emergency Board under the provisions of Section 10 of the Railway Labor Act, 45 U.S.C.A. § 160, and on May 20, 1960, the President created an Emergency Board under the provisions of this section, advising all parties of this order (Exhibit P–5).

▮ In addition to the foregoing facts, the hearing judge adopts Findings of Fact 1 to 16 requested by plaintiff, with the substitution of the words "this proceeding" for the words "the premises" in Requested Finding 5. The hearing judge has gone into this Scope Rules Dispute at this length because he finds that it is a substantial cause, if not the primary cause, of the work stoppages occurring on May 16 to 19, 1960, which are the subjects of this motion. Although there were references to the Steubenville and Conway incidents by pickets at Philadelphia and signs in New York (P–10), the concern of the Altoona union members (the largest group on strike) was primarily with the contracting of work off the premises [4] (see Exhibit P–25), which is part of the scope rules dispute. In view of the facts that the Emergency Board appointed by the President must report to the President within 30 days of May 20, 1960, and that § 10 of the Railway Labor Act (45 U.S.C.A. § 160) provides:

"After the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the

controversy in the conditions out of which the dispute arose."

this record requires the issuance of a temporary injunction effective at least until 30 days after the Board makes its report. See Elgin, J. & E. R. Co. v. Burley, 1945, 325 U.S. 711, 725, 65 S.Ct. 1282, 89 L.Ed. 1886; Railroad Yardmasters of America v. Pennsylvania R. R. Co., 3 Cir., 1955, 224 F.2d 226, 228. In the Elgin case, supra, the court said in 325 U.S. at page 725, 65 S.Ct. at page 1291:

"The parties are required to submit to the successive procedures designed to induce agreement. § 5 First (b). But compulsions go only to insure that those procedures are exhausted before resort can be had to self-help." [5]

As pointed out below, defendants have not shown that plaintiff acted in bad faith and defendants have it in their power to expedite the further mediation of the Steubenville dispute. Also, as noted below, the hearing judge finds that the T. W. U., as well as the locals, were responsible for the work stoppages during the week of May 16 and for numerous threats to strike, which, in view of the other facts, require this court to exercise its discretion to issue an injunction in order to carry out the above-quoted mandate of Congress.

B. Wage Dispute.

This matter started with a proposal by the T. W. U. on June 18, 1959, for additional paid holidays and changes in the vacation rule (N.T. 81). Additional proposals were made by the Union, including those involving health and welfare, in September 1959 (N.T. 821–3). Conferences held on these proposals were terminated by the T. W. U. sending a telegram stating its termination

---

4. This was also a primary concern of other union members (N. T. 409, 460).

5. In the most recent statement by the United States Supreme Court on the subject, the court stated that "a strike could be enjoined to prevent a plain violation of a basic command of the Railway Labor Act 'adopted as a part of a pattern of labor legislation.' [Brotherhood of R. R. Trainmen v. Chicago River & Indiana R. R. Co.] 353 U.S. 30, 42 [77 S.Ct. 635, 641, 1 L.Ed.2d 622]." Order of R. Telegraphers v. Chicago & N. W. R. Co., 362 U.S. 330, 80 S.Ct. 761, 766, 4 L.Ed.2d 774.

of negotiations and authorizing a strike (Exhibits P–6 and P–6A). On the next day, plaintiff applied to the National Mediation Board for mediation and the case was docketed by that Board as A6171 (see P–7 and P–7A). A mediator was assigned and mediation meetings were held in April 1960 (N.T. 88). At the hearing on this Motion, defendants admitted that they were waiting for the Mediation Board to make a decision (N.T. 412). At N.T. 436, Mr. Attreed testified that defendants were awaiting a decision by the Board on their "request for release" from mediation of that dispute. Neither party contends that this dispute justifies work stoppages or picketing at this time. Requests for Findings 18 and 19 of plaintiff on this point are affirmed.

### C. Steubenville Dispute.

Plaintiff published Advertisement No. 12 at Mingo Junction, Ohio, about May 3, 1960 (see Exhibits P–18 and D–4). T. W. U.'s Local 2008 objected to positions 21 and 22 as re-advertised in such advertisement on the ground that they did not state the "duty" of the job, as required by paragraph 2–A–1–b of the collective bargaining agreement (see P–1D, page 1). Defendants contend that the statement "car repairmen" is not a sufficient designation and that the primary duty, such as "oiler," "bucketer," or "heater" should be stated on the advertisement. In accordance with the terms of the negotiation machinery set up in the collective bargaining contract, negotiations were held at the level of the "Foreman" and "Superintendent of Personnel." See Section 7–B–1 and 7–B–2 at page 12 of Exhibit P–1A. A conference was held on May 13, 1960, with a representative of the Superintendent of Personnel at which the Union's protest was overruled and the positions assigned under the advertisement were posted late that day, to be effective at the close of tour of duty May 16, 1960. Plaintiff refused to further delay the new job description, which does not affect seniority or pay of the workers, even though the Union requested maintenance of the status quo until further negotiations had been conducted. Under the terms of the contract (Exhibit P–1A), the Union has until June 12, 1960 (30 days from May 13, 1960) to request that a Joint Submission be prepared in accordance with the terms of Section 7–B–3 of the Agreement (pages 12 & 13 of P–1A). This matter is clearly still in negotiation, as provided for in the collective bargaining agreements, until such 30 days has expired.

As the result of this dispute, Local 2008 sent plaintiff a telegram, certifying that all the members of its local were to act in the capacity of Shop Stewards to represent members of the local (P–19) and called a round-the-clock meeting of all such Shop Stewards to begin at 7 a. m. on May 16. Plaintiff suggested the arrangement of another negotiating meeting on May 16 at the Superintendent of Personnel level, but this was rejected by Local 2008 because of plaintiff's refusal to delay the effectiveness of the new job descriptions.

As stated above, there are indications that the work stoppages at Philadelphia and New York were caused in part by this Steubenville dispute, but there is no indication that the T. W. U. members in the northern region and at Altoona, Pa., and Wilmington, Del., where the most substantial work stoppages occurred, knew anything about this dispute. The International Representative in the northern region had only heard of the existence of the work stoppage at Mingo Junction and reported this to Mr. Fassano (a Vice President of Local 2017).

Plaintiff's requests for Findings 21 and 22 are affirmed on this point.

Even if, as counsel for the defendants contends, the Steubenville dispute, and not the scope rules dispute, was the cause of the work stoppages and picketing, plaintiff is entitled to a preliminary injunction at this time to carry out the purposes of the Railway Labor Act (45 U.S.C.A. § 151 ff.) in securing the mediation of that minor dispute. Manion et al. v. Kansas City Terminal Railway Co., 1957, 353 U.S. 927, 77 S.Ct.

706, 1 L.Ed.2d 722, relied on by the defendants, is distinguishable. In that case,[6] the dispute concerning time claims for penalty pay had been carried through all the levels of management, as provided for in the existing collective bargaining agreement between the parties, and the claims had been rejected. The union sought to bring the dispute before a National Mediation Board invoked by the carrier to assist in resolving another dispute. The carrier refused to discuss the time claims dispute, claiming that it was not mediable and that a provision in the collective bargaining agreement barring appeals from the final decision by the highest level of management after six months prevented any further discussion of the matter since that time had expired. The union called a strike and it was enjoined. The Supreme Court vacated the judgment "in the light of our decision in Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., 353 U.S. 30, 77 S.Ct. 635, [1 L.Ed.2d 622] because the dispute here is not pending before the National Railroad Adjustment Board." The cause was remanded for further proceedings not inconsistent with the decision and without prejudice to the Court of Appeals to reinstate its judgment if the dispute was submitted to the Adjustment Board by either party within a reasonable time.

In Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. R. Co., 1957, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622, the court sanctioned an injunction against a strike induced by a minor dispute because the Railway Labor Act substituted a reasonable alternative. 353 U.S. 30, at page 41, 77 S.Ct. 635, at page 640. In the opinion of this court, this alternative includes not only the services of the Railroad Adjustment Board, which was created by the Railway Labor Act, 45 U.S.C.A. § 153, as defendants contend, but also the preliminary negotiations through channels established by the parties "up to and including the chief operat-

ing officer of the carrier designated to handle such disputes," which the Act expressly contemplates will precede referral to the Board (45 U.S.C.A. § 153, First (i)) and which procedure the Board was to augment. See, also, Louisville & Nashville Railroad Company v. Brown, 5 Cir., 1958, 252 F.2d 149, 153, 154.

In the Manion case, supra, the negotiation procedures established by the parties had been exhausted and the Railroad, relying on the six months limitation period in the collective bargaining agreement, contended that no further procedures were available. Thus, the union was left without any "reasonable alternative" to a strike. Therefore, the Supreme Court, on the authority of the Chicago River case, supra, denied the injunction unless that alternative was supplied by continuing along the course of negotiation established by Congress from the point at which they had broken off. In the case at bar, the parties are still pursuing, or have open to them, the course of negotiations defined by their collective bargaining agreement, which the Railway Labor Act contemplates will take place before the services of the Railroad Adjustment Board are invoked. Therefore, an injunction is appropriate at this time. This is the rule followed by this court on two previous occasions. See Pennsylvania Railroad Co. v. Transport Workers Union, D.C.E.D.Pa.1957, 178 F.Supp. 30, and Pennsylvania R. Co. v. Local 2013 of United R. Workers, etc., D.C.E.D.Pa.1959, 178 F.Supp. 53.

### D. Other Disputes.

The record discloses that at Canton, Ohio, Wilmington, Del., Philadelphia, Pa., and other locations on the plaintiff's railroad there were various pending grievances concerning the application and interpretation of the collective bargaining agreement. These local grievances were contributing causes to work

---

6. The facts recited here are taken from the opinion of the Kansas City Court of Appeals, Kansas City Railway Company v. Manion, 1956, 297 S.W.2d 31, at pages 32, 33.

stoppages at these points. These grievances, including the grievances referred to above as the Steubenville Dispute, should have been processed by the T. W. U. and its local unions under Section 7–B of the contract (Exhibit P-1A). See authorities cited under Steubenville Dispute above.

### Work Stoppages.

Work stoppages occurred at the following locations on the following dates and continued until May 19, 1960, after service of the May 18, 1960, Temporary Restraining Order of this court and the back-to-work directive of the T. W. U. (see Exhibit D-3):

| Location | Pickets | Date |
| --- | --- | --- |
| Mingo Junction, Ohio | Yes | May 16, 1960 |
| Conway, Pa.[7] | Yes | May 17, 1960 |
| Philadelphia, Pa. | Yes | May 18, 1960 |
| Wilmington, Del. (Shops) | Yes | May 18, 1960 |
| Altoona, Pa. (Shops) | Yes | May 18, 1960 |
| Oil City, Pa. | Yes | May 18, 1960 |
| Erie, Pa. | Yes | May 18, 1960 |
| Elmira, Pa. | Yes | May 18, 1960 |
| Northumberland-Sunbury, Pa. | Yes | May 18, 1960 |
| Buffalo, N. Y. | Yes | May 18, 1960 |
| Canton, Ohio | Yes | May 18, 1960 |
| Cleveland, Ohio | Yes | May 18, 1960 |
| New York Region (including New Jersey Shore Points) | Yes | 12:01 A. M. on May 19, 1960 |

The above locations are ones where witnesses were produced to testify to the stoppages and the serious effect on transportation which occurred. Work stoppages at many other points and the serious effect of these stoppages are reflected in Exhibits P-2 to P-2D.[8]

On April 6, 1960, the Philadelphia Local (No. 2013) followed a practice which was not new to it (see cases reported at 178 F.Supp. 30 and 53 referred to above) of certifying virtually all of its members as Committeemen (see Exhibit

P-14, containing 836 names) and then calling a meeting of such Committeemen during working hours (see P-13).[9] This device was followed by the T. W. U. Locals during the week of May 16, following the initial telegram referred to above (P-19), dated May 15, from the Steubenville Local. Fifteen telegrams (P-8A, P-8H, P-9A, P-9B, P-11, P-12 and P-21A to P-21D) with language almost identical to the following were received by plaintiff from 15 separate locals on May 18: [10]

8. Since defendant has objected to the admission of these exhibits as business records, all the work stoppages have not been set forth above, even though the hearing judge rules that these exhibits are admissible.

9. The proposed meeting at 2 p.m. on April 7 was cancelled, but Mr. Mellon testified that this device was used to secure the protection afforded by Section 8–1 of the agreement (P–1, pp. 56–57), granting leaves of absence to committeemen and representatives.

10. In addition to these 15 Locals, Local 2013 called a meeting on May 18 and the following two Locals certified their members as Committeemen orally and called meetings on May 18: Local 2001

"Dear Sir Be Advised All Members Of Local 2046 Under TWU CIO Are Now Certified As Committeemen And We Are Calling A Special Meeting Immediately

F R Stettler, President"

Also, Local 2013 called a 24-hour meeting, to begin on May 18 at 3 p. m. (P-17), having previously certified its members as Committeemen as noted above.

The work stoppage at each local stopped as soon as word of T. W. U.'s decision that work should be resumed due to the issuance of the restraining order (D-3) was received.

█ In view of the above facts established by direct evidence, the hearing judge finds that the work stoppages were subject to the control and sponsorship of the T. W. U. Paragraphs 24 and 25 of plaintiff's Requests for Findings are affirmed on this point.

The facts recited above establish that there is an immediate threat of irreparable harm to plaintiff from the work stoppages occurring during the week of May 16 and the threats of strikes by the officers of the T. W. U. and its locals during the past, particularly the last six months. Paragraphs 27 to 29 of plaintiff's Requests for Findings of Fact on this point are affirmed. The testimony of Mr. Harris at N.T. 54 establishes that shippers turn to other sources of transportation and a railroad such as plaintiff loses customers when there are work stoppages to the extent involved in this case during the week of May 16. The testimony of Mr. Harris at N.T. 50 ff. establishes the serious effect of these work stoppages on the railroad's business.

█ Defendants' able counsel have forcefully contended that, even if the court has the discretion to issue a preliminary injunction, such discretion should not be exercised at a time when

a Presidential Board is trying to make a last effort to negotiate a settlement, particularly in view of T. W. U.'s action in directing its members to comply with the Temporary Restraining Order of May 18. However, the testimony of the T. W. U.'s staff member, Mr. Granata, and of local presidents, such as Mr. Mellon, frankly admit inability to control the rank and file members during the week of May 16 until the restraining order was entered on May 18. Under such circumstances, a legal restraining order is necessary to carry out the purposes of the Railway Labor Act.[11] Congress has stated that these purposes of the Railway Labor Act include:

"\* \* \* (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; \* \* \* (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions. \* \* \*"
(45 U.S.C.A. § 151a.)

Persons working for a business affected with a public interest are required to give up their freedom of action and comply with legislative rules required by the nature of the undertaking. See Wilson v. New, 1917, 243 U.S. 332, 349 & 353, 37 S.Ct. 298, 61 L.Ed. 755. Cf. Murphy, Injunctive Prevention of Strikes on Railroads and Airlines, 9 Labor Law Journal 329 (1958). In this connection, paragraph 26 of plaintiff's Requests for Findings of Fact is affirmed.

Paragraphs 1–10 of plaintiff's Requests for Conclusions of Law are adopted as the Conclusions of Law of the court, with these additions:

A. At the end of paragraph 1, add

---

at New York (N. T. 167 ff.) and Local 2015 at Wilmington, Del. (N. T. 276–8).

11. The testimony was that the officials of the Brotherhoods were urging plain-

tiff to get rid of the pickets so that they could get their men to work (for example, testimony of Mr. Daniels).

"See 28 U.S.C.A. §§ 1331 & 1337 and 45 U.S.C.A. § 151 ff.";

B. At the end of paragraph 2, add "See 'A. Scope Rules Dispute' at pages 4–10 above";

C. At the end of paragraph 3, add "See 'B. Wage Dispute' at page 10 above"; and

D. At the end of paragraph 4, add "See 'C. Steubenville Dispute' and 'D. Other Disputes' at pages 10–15 above." Plaintiff is entitled to a preliminary injunction in the form being filed with these Findings of Fact and Conclusions of Law.

Form of Preliminary Injunction.

■ There are attached hereto letters dated May 27, 1960, from both counsel, commenting on the form of preliminary injunction included in plaintiff's Requests for Conclusions of Law. The suggested language has been changed in an effort to comply with point 1 of plaintiff's letter and the language of F.R.Civ. P. 65(d), 28 U.S.C.A. The named individuals are identified in the record as officers of T. W. U. locals responsible for work stoppages and/or picketing, except for Roy Granata, who is a staff officer of T. W. U. See Exhibits P-8A–P-8H, P-9A, P-9B, P-11, P-12, P-19, P-21A–P-21E, P-10, N.T. 167 ff., 276–280, 546 ff. and 595 ff. In view of the statements of several of them that this proceeding did not apply to them, it is in accordance with the policy that such an order be "specific" expressed in F.R.Civ.P. 65(d) to particularize the scope of the injunction as to these individuals and their unions.

As to point 2, the hearing judge believes that it is best to use the wording of the above Rule, which includes attorneys.

Point 3 of plaintiff's letter is being rejected because both T. W. U. and Local

2013 testified that they cannot control their membership, as pointed out above, and because these unions have a history of activities requiring injunctive relief, both on the part of this court and of the United States District Court for the Western District of Pennsylvania.[12] See cases cited at page 921, including footnote 2 at 178 F.Supp. 60 and footnote 7 on page 922. The hearing judge would expect to review the situation thirty days after the report of the Presidential Board and it is no great burden to require defendants to file a Motion for this purpose. This course is consistent with the tentative nature of a preliminary injunction as emphasized by the United States Court of Appeals for the Third Circuit in Railroad Yardmasters v. Pennsylvania Railroad Co., supra, at page 229 of 224 F.2d.

Counsel for defendants has no objection to the description of the prohibited acts (N.T. 687).[13]

---

12. It is noted that, during the work stoppages on May 18–19, numerous representatives of local unions stated to plaintiff's officials that they could not send their men back to work until they heard from Mr. Quill or other T.W.U. representatives (see, for example, N. T. 203–4).

13. Defendants' Motion to Strike, appearing at N. T. 29–30 is denied.