**The PENNSYLVANIA RAILROAD COMPANY**

v.

**TRANSPORT WORKERS UNION OF AMERICA, A.F.L.–C.I.O. et al.**

**Civ. A. No. 41856.**

United States District Court
E. D. Pennsylvania.
Jan. 13, 1967.

Robert M. Landis, Warren D. Mulloy, and Matthew J. Broderick, Philadelphia, Pa., for plaintiff.

Charles A. Lord, Philadelphia, Pa., for defendants.

## SUR MOTION FOR PRELIMINARY INJUNCTION UNDER RAILWAY LABOR ACT, 45 U.S.C.A. § 151ff., AND PROOF

VAN DUSEN, District Judge.

The basic cause of this labor dispute is the contention of defendant TWU that the abolition of certain jobs at the plaintiff's Altoona shops, resulting in the placing of over 300 [1] TWU members on furlough on January 11, would not have been necessary if plaintiff had not contracted its work out to outside contractors (N.T. 11 & pp. 28–31 and 39–40 of Kaelin deposition, being Document 16), and the frank statement of defendant TWU that it may not be able to control the furloughed employees from violating the collective bargaining agreements (see Exhibit P–1), so that picketing and disruption of plaintiff's railroad operations are possible (N.T. 11–12).

Paragraphs 1–5, 7, 8, 10 and 14–19 of Plaintiff's Requests for Findings of Fact, which defendants agree are accurate statements of fact, establish that (a) plaintiff is an interstate railroad which is an integral part of the national railway system, transporting many thousands of passengers (over 73,000—see N.T. 40) to and from Philadelphia daily, (b) defendant TWU is a labor union, which represents, for the purposes of the Railway Labor Act, approximately 10,-000 of plaintiff's employees, (c) Local 2013 is TWU's railroad local in the Phil-adelphia area and it is truly and fairly representative of the other railroad local unions of TWU, including Local 2017, which represents the employees in the plaintiff's Altoona Works, (d) the individual defendants are either international executive officers of TWU or officers of Local 2013, and (e) there are in effect collectively bargained agreements, concluded under the Railway Labor Act between plaintiff and TWU, governing rates of pay, rules and working conditions for the above 10,000 employees (see Exhibit P–1). These collective bargaining agreements contain provisions relating to reduction in forces employed by plaintiff and providing for the abolishment of positions, as well as grievance procedures for the processing of any disputes concerning the interpretation or application of the agreements.[2]

On or about January 5, 1967, plaintiff, acting in accordance with the applicable agreements, caused notices to be posted advising of the abolishment of certain positions at the Altoona Works in Altoona, Pennsylvania, effective on or about January 12, 1967.[3]

The above-described abolishment of positions had been discussed with the executives of TWU in November 1966, at which time plaintiff's representatives had promised to meet with such executives before announcing such furloughs (N.T. 51–52). At TWU's request, certain furloughs planned for December 1966 were deferred by plaintiff until this month (N.T. 74). The promised meeting was held January 4, 1967, in Phila-

---

1. Although defendants have said they believe about 500 of their members will be laid off as the result of the jobs abolished effective this week, as described below, the only definite testimony by a witness with personal knowledge is that 330 men will be laid off at this time, all of whom may not be in the TWU union, depending on seniority, etc. (N.T. 66). At some unspecified time in the past, the record shows that about 350 other men have been furloughed in Altoona (N.T. 76).

2. These provisions include the establishment of a Systems Board of Adjustment to handle disputes such as that involved in this litigation (see pp. 339–340 of Exhibit P–1) and an agreement (pp. 315–317 of Exhibit P–1) that disputes with regard to arrangements by the company with outside concerns for performance of work may be handled promptly through written notice given by the Union. No such written notice has been given in this case.

3. Defendants have the right under Section 3–D–1 ff. of the collective bargaining agreement (pp. 55 ff. of P–1) to post notices of force reduction on five days' notice.

delphia, at which time Mr. Kaelin insisted that plaintiff reconsider its decision to furlough the employees in the light of the action "we might take. We are not going to take this layoff. The men who lose their job can form pickets, they can march down our tracks \* \* \* [into] Harrisburg and picket the State Capitol, just to bring to the attention of the new Governor, Mr. Shafer, the sort of thing that the Pennsylvania Railroad is doing to some of its senior employees. \* \* \* These furloughed men could picket other railroad installations and that we could rest assured that the members of his Union would not cross the picket lines." He also said that he would take "their case to the press" (N.T. 60). When plaintiff refused to reconsider its decision on the furloughs, Mr. Kaelin said (N.T. 61):[4]

"Well, if this is the case, you can expect real trouble. At the end of next week we are in a strike situation with the PTC, we have the same problem with the Red Arrow, we might as well bring the Pennsylvania into this and have a real show out of it."

No grievances or other arbitration machinery has been invoked by the TWU under the collective bargaining contract (N.T. 61–62).

On January 5, 1967, Mr. Kaelin invited the press to a conference at the Franklin Motor Inn in Philadelphia, at which the President and Vice President of Local 2017 were present. These officers of Local 2017 told Mr. Kaelin that the 300 furloughed workers might organize themselves into a band of pickets and might develop into traveling squads establishing picket lines on plaintiff's railroad from New York to St. Louis (pp. 42–46 of Document 16). At that time, Mr. Kaelin suggested the furloughed men picket the executive offices of plaintiff at Six Penn Center Plaza, Philadelphia.

4. See, also, N.T. 70, 79–80, 83–85, 91–93.

5. Part of paragraph 19 was modified in the stipulation. See N.T. 31–32. Threats of a work stoppage by TWU during a 1963

Mr. Kaelin used this language when his deposition was taken on January 10 (pp. 52–53):

"My answer at the conference was that we have a moral right to adhere to the agreement. We are a responsible organization and we will; and it is not our intention to stymie the Railroad in any way with the exception that we will leave no stone unturned, that would not bother the Railroad, to let the people know of how the Railroad is treating the workers."

Although Mr. Kaelin advised the members of the Altoona Works Local (2017) at a meeting on January 11 not to have any strike or work stoppage (N.T. 89), the members of that Local advocated that the leaders of TWU should tear up "the injunctions like Mike Quill did in New York" (N.T. 92–93).

The adverse effects of a work stoppage on the plaintiff railroad at this time, when a strike of the Philadelphia transit system is imminent, are described in the above-mentioned paragraphs 14–19[5] of Plaintiff's Requests for Findings (Document 17). Plaintiff's General Manager of Transportation testified as follows (N.T. 38):

" 'A When there is any announcement of a strike threat affecting the movement on our railroad, we get a number of calls from shippers, particularly traffic managers of large companies and people handling produce— also, importers and exporters where they have cars that are scheduled or sailings on export movement of ships —and this builds up as you get nearer to the time of the strike until you usually get—I usually acquire a calling list and they will check with me every day on whether there have been new developments and ask me to call them if there is a settlement.

strike of the Philadelphia transit system (p. 5 of Document 15 in C.A. 32670) led to this court's entry of a temporary restraining order (Document 3 of C.A. 32670).

" 'Q   Have you had a similar experience in connection with the strike threats that have been publicly announced during the past weeks?

" 'A   I have had some calls from it.

\* \* \*

\* \* \* \* \* \*

"A   The night before last at the annual meeting of the Philadelphia Traffic Club, there were at least seven different traffic managers who asked me the progress of the trouble that was apparently boiling up, as they would put it, in the Altoona territory with the TWU."

The position of the local unions of TWU, such as 2017 has been adequately represented by the able counsel for the defendants.

### Discussion of Law

■   The evidence makes clear that there is a substantial threat of immediate and irreparable harm both to plaintiff and to the public from the admitted inability of the TWU executives to control over 300 furloughed workers (See pp. 2 & 5 above) who continue in an employment relationship with plaintiff. Picketing by such workers in such a way as to interfere with the operations of the railroad at a time when alternative methods of transportation to and from Philadelphia will be curtailed would be a public disaster.

■   On this record and in view of the grievance and arbitration procedures available under Exhibit P–1, plaintiff is entitled to a preliminary injunction at this time to carry out the purposes of the Railway Labor Act (45 U.S.C. § 151 ff.) in securing mediation of this relatively minor dispute.   See Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. R. Co., 353 U.S. 30, 41, 77

S.Ct. 635, 1 L.Ed.2d 622 (1957);  Hilbert v. Pennsylvania Railroad Company, 290 F.2d 881 (7th Cir. 1961);  Pennsylvania Railroad Co. v. Transport Workers Union, 178 F.Supp. 30 (E.D.Pa.1957);[6] see, also, Brotherhood of Rail. Train. v. New York Cent. R. Co., 246 F.2d 114 (6th Cir. 1957), cert. den. 355 U.S. 877, 78 S.Ct. 140, 2 L.Ed.2d 107 (1957).

The existence of a preliminary injunction, the violation of which can cause damage to the finances of their Union as well as problems for their Union leaders, should be a factor in securing compliance with the law on behalf of the above-mentioned 300 furloughed men. In addition, the existence of the preliminary injunction cannot result in any harm to the executives of TWU, assuming that their position accords with that stated by Mr. Kaelin at the top of page 5 above, since this court has no interest in penalizing a labor leader who makes every effort to see that his collective bargaining agreements are carried out.

In order to assure that defendants are not deprived of the rights guaranteed under the freedom of speech clause of the First Amendment, a proviso will be included in the decree entered in this case to permit peaceful demonstrations, properly approved by local authorities in exercise of the police power.   If this proviso or any provision of the decree is abused or is not sufficiently clear, application may be made for its change by any party.   See attached letter of 1/13/67 from defendants' counsel.

The conclusions of law requested by the plaintiff in Document 17 are affirmed.

The foregoing constitutes the findings of fact and conclusions of law on this Motion for a Preliminary Injunction.

6.  For additional authorities, see Pennsylvania Railroad Co. v. Transport Workers Union, 191 F.Supp. 915 (E.D.Pa.1960), aff'd 280 F.2d 343 (3rd Cir. 1960).